POWERS *v.* HIBBARD.

VOIGT *v.* POWERS.

| 114 | 533 |
|---|---|
| 115 | 304 |
| 114 | 533 |
| 116 | 445 |
| 114 | 533 |
| s72NW | 339 |
| f129 | ²422 |
| 114 | 533 |
| s72NW | 339 |
| 130 | ⁵ 76 |
| 114 | 533 |
| s72NW | 339 |
| e132 | ⁷ 41 |
| 114 | 533 |
| 137 | 515 |

1. WATER RIGHTS—WRONGFUL DIVERSION—INJUNCTION—PARTIES.
    The owners of a water-power canal on one side of a river, who have agreed with the owner of a canal on the other side of the stream, taking water at the same dam, upon an equal division of the water between them, are not necessary parties to a bill filed by the latter to enjoin the use of water by one of his grantees in excess of the amount granted, and for an accounting as to such excess; nor are other separate grantees of water privileges from the complainant necessary parties to such suit.[1]

2. EQUITY PRACTICE—WANT OF PARTIES—DEMURRER.
    An objection of a want of necessary parties in a chancery suit should be raised by demurrer before answer, where the facts showing the necessity of such parties, if any, are fully disclosed by the bill.

3. SAME—CROSS-BILL.
    The rule that a cross-bill must be confined to the subject-matter of the original bill does not preclude the introduction by cross-bill of new facts bearing upon that subject-matter.

4. SAME—WATER RIGHTS.
    Thus, a complainant in a suit for the construction of a deed conveying water privileges, and for an account of an excess of water claimed to have been used by defendants, in which a bill of revivor and supplement is filed by purchasers of defendants' interest, stating that they have become the owners of such interest, and entered into possession, and that controversies have since arisen between them and complainant as to the quantity of water used, and denying that they have misapplied or wasted any water, may set up by way of cross-bill that such purchasers have bought additional interests, and have reconstructed their mill and changed the water wheel in an improper manner, and are using a specified amount of water in excess of that to which they are entitled under their several grants.

---

[1] The division of water between opposite riparian proprietors is the subject of a note to *Warren* v. *Westbrook Manfg. Co.*, ( Me.) 26 L. R. A. 284.

5. DEEDS—CONSTRUCTION—HABENDUM CLAUSE.
    Where there is a repugnancy between the granting clause and
    the *habendum* of a deed, the former must control, unless the
    *habendum* appears to be in accord with the intention of the
    grantor, in which case the latter will control.

6. SAME—PAROL EVIDENCE.
    The circumstances attending the execution of a deed may be
    shown by parol for the purpose of ascertaining the intent of
    the parties, where the deed is ambiguous, but not for the pur-
    pose of varying the terms of the grant by adding thereto or
    taking therefrom.

7. SAME—EASEMENTS—WATER PRIVILEGES.
    The owner of a water power conveyed, as appurtenant to a
    mill site, "the right to take and draw water  *  *  *  for
    the purpose of power to the extent of three runs of millstones,
    as described below.  *  *  *  When used for flouring pur-
    poses, each of said run of millstones  *  *  *  shall be so un-
    derstood that the same shall include all the machinery nec-
    essarily or ordinarily used for operating all departments of
    a flouring mill properly and economically conducted." The
    *habendum* clause provided: "The term 'run of millstones,'
    as above used, is a power sufficient to grind, when used for
    grinding, 13 bushels of wheat per hour, and, when used for
    propelling machinery for other purposes, 15 horse power, as
    the same is ordinarily estimated.  *  *  *  It being also ex-
    pressly understood that the water power  *  *  *  is divided
    by the proprietor thereof into  *  *  *  66 runs of millstones
    as above defined,  *  *  *  none of which runs of millstones
    *  *  *  do or are to have any priority of right to the use of
    water in low stages thereof over or as against each other."
    The power granted was used to operate a flouring mill, which
    was afterwards equipped by the owner with new machinery.
    *Held*, (1) that the deed should be construed as granting a maxi-
    mum of 15 horse power per run of millstones, notwithstand-
    ing that amount was insufficient to grind 13 bushels of wheat
    per hour by the new machinery,—particularly as the owner
    of the easement had purchased additional runs of stones by a
    contract recognizing that his rights under the deed were thus
    limited; and (2) that, at times of low water, when the total
    power was less than 66 runs of stones, the right granted was
    limited to the use of 3-66 of the existing power.

Cross-appeals from superior court of Grand Rapids;
Burlingame, J.   Submitted May 4, 1897.   Decided Octo-
ber 5, 1897.

Bill by William T. Powers against Wellington Hibbard and Peter Graff, Jr., to restrain the wrongful diversion of water for power, and for an accounting. Defendants' interest thereafter passed to Carl G. A. Voigt and William G. Herpolsheimer, who filed a bill of revivor and supplement, to which Powers filed an answer in the nature of a cross-bill. From a decree granting affirmative relief to Powers under his cross-bill, both parties appeal. Affirmed.

*Kingsley & Kleinhans*, for complainant Powers.

*Crane, Norris & Stevens*, for defendants Voigt and Herpolsheimer.

LONG, C. J. This controversy involves the water power on the west side of Grand river, in the city of Grand Rapids. The power is furnished by a dam at the head of the rapids. There are two canals extending from the dam down the river, one upon either side. The complainant in the original bill, in 1866, was the owner of the power on the west side. Prior to 1866, guard gates had been constructed at the head of the canal on the east side. This power was owned by Martin L. Sweet and others. On August 15th of that year, by a contract in writing, the owners of the power on the east side agreed with complainant Powers to build a dam across the river from these head gates, and that he should "hold, use, and enjoy the one-half part of all the water of Grand river as it shall flow and continue to flow into the pond made by such dam when constructed, subject only to the rights of the public therein, wholly irrespective of where the main channel or current of said river naturally may be." A like agreement was inserted in the same contract, giving Martin L. Sweet and the other owners like privileges on the east side. From that time the complainant has been the owner of this power on the west side.

On May 29, 1873, the complainant and his wife conveyed to David L. Stiven certain lands and water privileges, as follows:

"The said parties of the first part, for and in consideration of the sum of $10,750, to them in hand paid by the said party of the second part, the receipt whereof is hereby confessed and acknowledged, have granted, bargained, sold, remised, released, aliened, and confirmed, and by these presents do grant, bargain, sell, remise, release, alien, and confirm, unto the said party of the second part, his heirs and assigns, forever, the following described lands, premises, water power, and other privileges and easements situate and being in the city of Grand Rapids, county of Kent, and State of Michigan [description omitted], with a right, as connected with and appurtenant to said lands and premises, to put in a flume extending from the said described premises to the canal adjacent thereto, which flume shall be so constructed and maintained as to admit of the free and safe passage of teams over the same at all times, and which flume forever shall be for the exclusive use of said lands and premises and the water rights hereinafter conveyed to be used thereat, and forever shall be kept and maintained by the said party of the second part, and those claiming by, from, through, or under him, at his and their own expense. Also, the right to take and draw water from the said canal at all times hereafter, and use on said lands and premises, but not elsewhere, water for the purpose of power to the extent of three runs of millstones, as described below, which power may be used on said lands and premises for any purpose as propelling power; but, when used for flouring purposes, each of said run of millstones, as named and described below, shall be so understood that the same shall include all the machinery necessarily or ordinarily used for operating all departments of a flouring mill properly and economically conducted, which said three runs of millstones are of the first class, as hereinafter provided and explained, and are runs numbered 20, 21, and 22 of said first class; it being expressly understood and provided that the lands, premises, rights, and water power, and the interest and estate therein hereby created, and vested in said party of the second part, shall for all time hereafter be held by him and those claiming or to claim by, from, through, or under him, charged and subject to the limitations and conditions as to the use of water, and the proportional expense of keeping said canal and the dam across Grand river at the head thereof in order and repair, as hereinafter provided.

"Together with all and singular the hereditaments and appurtenances thereunto belonging or in any wise appertaining, and the reversion and reversions, remainder, remainders, rents, issues, and profits thereof, and all the estate, right, title, interest, and demand whatsover of the said parties of the first part, either in law or equity, of, in, and to the above-bargained premises, with the water power, hereditaments, and appurtenances, to have and to hold the said premises as above described, with the appurtenances, unto the said party of the second part, and to his heirs and assigns, forever. And the said parties of the first part, for themselves, their heirs, executors, and administrators, do covenant, grant, bargain, and agree to and with the said party of the second part, his heirs and assigns, that, at the time of the ensealing and delivery of these presents, they are well seised of the premises above described, as of a good, sure, perfect, absolute, and indefeasible estate of inheritance in the law, in fee simple; and that the said lands and rights are free from all incumbrances whatever; and that the above-bargained premises, in the quiet and peaceable possession of the said party of the second part, his heirs and assigns, against all and every person or persons lawfully claiming or to claim the whole or any part thereof, we will forever warrant and defend.

"It being expressly understood that the term 'run of millstones,' as above used, is a power sufficient to grind, when used for grinding, 13 bushels of wheat per hour, and, when used for propelling machinery for other purposes, 15 horse power, as the same is ordinarily estimated. And it being also expressly understood and agreed that the water power above described shall at all times be used by said party of the second part, his heirs and assigns, in such manner as shall secure the greatest amount of head and fall at the place herein designated for its use, and shall also be used carefully and economically with water wheels of the most approved pattern and design, at least of the economy and capacity of the 'Johnsville Wheel,' so called. And it being also expressly understood that the water power on the west side of Grand river, at said city of Grand Rapids, Kent county, Michigan, is divided by the proprietor thereof into two classes, the first of which classes includes and comprises 66 runs of millstones as above defined, numbered consecutively from 1 to 66, inclusive, none of which runs of millstones in said first class do or are to have any priority of right to the use of water

in low stages thereof over or as against each other, but all of which said first class do and shall have such priority over all and any of the second class in case of low water, and which second class, numbering from 67, inclusive, are subrogated to the right of said first class in that respect, and shall not be used when by reason of low water their use will be detrimental to the fair and ordinary use of any of the first class, and the rights of the owners thereof, but which said second class do and shall have the right of priority over each other in the use of water (in case of insufficiency for the use of all), according to and in the order of their numbers, numbering from number 67, which is first in priority of said second class. And it is hereby further understood and agreed between the parties hereto that the party of the second part, or those claiming under him, shall maintain and keep in good repair a roadway on the bank of the canal on the west side of said described premises, and shall not obstruct or cause to be obstructed, or so arrange said roadway as not to permit, the free, safe, and commodious use of the same at all times for the passage of teams to and from the lands and premises adjacent on the south of said premises; and that said second party shall not do or suffer any act or thing whatever which shall or may tend in any manner or degree to lessen or obstruct the free flow of water in said canal, or prejudice the rights of other water power owners thereon; and, further, that he will at all times and under all circumstances bear and pay his due proportion of the expense of keeping said canal, and the dam at the head thereof, in repair, the same to be assessed equally upon such of the second class as have been sold by said Powers, and all of the first class, share and share alike.

"In witness whereof," etc.

Stiven at once began to build upon the premises a mill designed to use stones for grinding, with three 36-inch wheels to drive the three millstones, and one 42-inch wheel to drive the machinery. Defendants Hibbard & Graff thereafter became possessed, through several *mesne* conveyances, of all the rights and privileges in the premises which Stiven had under his deed. In 1875 the mills were completed, and called the "Crescent Mills."

The original bill in this case was filed in 1877. Defend-

ants answered the bill. In 1882 the complainants in the supplemental bill, Voigt & Herpolsheimer, became the owners, under conveyances to them, of all the Stiven rights. They thereafter, in 1882 and 1883, purchased from Mr. Powers four additional runs of stones. The contract of 1882 provided that they should have the right to take and draw water from the canal adjacent to the lands and premises owned by them, to use on such lands and premises, but nowhere else (except as thereinafter provided), for the purpose of power, to the extent of three runs of millstones of the first class, and referred to and described as runs numbered 27, 28, and 29 of said first class. The contract had the same provision as to water wheels and head and fall as the complainant's deed to Stiven; but the provision in regard to 13 bushels an hour when used for grinding was omitted, and the term "run of millstones" was defined in the contract as follows: "It is expressly understood and agreed that the term 'run of millstones,' as herein used, is a power equivalent to 15 horse power, and no more, as the same is ordinarily estimated." This contract recited that the parties of the second part contemplated making certain changes and repairs in the flouring mill, and, when such changes and repairs were completed, they might require more than 90 horse power to operate and run the mill; and, if more power was necessary, Powers was to sell and convey to them the right to draw water from the canal to use on said premises, but nowhere else, to the extent of one run of millstones, "as hereinbefore defined." This run was designated as "No. 45 of the First Class." It was further stipulated in the contract that, as soon as the changes were made, "the parties hereto shall proceed and ascertain whether said mill can be operated and run with 90 horse power, and, if more is required, then the parties of the second part shall forthwith execute and deliver to the party of the first part their note, dated on the day when such fact is ascertained, for $2,250, due in four years." No test was made, but thereafter Powers conveyed to them the run numbered 45 of

the first class, and with like conditions as contained in the contract of 1882. Voigt & Herpolsheimer rebuilt the mill, at large expense, and changed it from a new process mill to a roller mill, and commenced to operate it in August, 1883.

In 1888 they filed a bill of revivor and supplement against Powers, alleging their possession of the property since June 19, 1882; that a controversy had since arisen between them and Powers concerning the quantity of water power used by them at said mill; that such controversy could be settled only by a construction of the deed from Powers to Stiven; that, by virtue of that grant, they had a right to draw water from the canal sufficient to grind 39 bushels of wheat per hour, and also drive all the necessary machinery of a flouring mill of that capacity; that they had not ground upon the premises by use of water drawn from the canal, under the grant to Stiven, to exceed 39 bushels of wheat per hour; that they had complied with all the provisions and kept all the conditions contained in the grant; that Powers claimed that all the power granted to Stiven by his deed for grinding was 45 horse power, and no more, and that the grant did not confer a right to use water from the canal for grinding on more than three runs of millstones, or to drive machinery of a patent process mill; but that they claimed that they were not to be restricted to any number of wheels or runs of stones or kind of machinery or process of flouring. They further insisted that a power that was sufficient to grind 39 bushels of wheat per hour on three runs of stones with the machinery then used was the measure of water they might draw from the canal for flouring, and that they had the right to spread that quantity of water on any number of wheels, and drive any number of runs, with the improved machinery of any process of flouring that should not grind in fact more than 39 bushels of wheat per hour. They asserted that they had not wasted the water; that the claims made by Powers tended to wrong and injure them; and that Powers had neglected

to file a supplemental bill on his part, for which he had obtained leave of court, etc.

Powers filed an answer to the bill, and prayed the benefit of a cross-bill, in which he averred that he executed the contract of August 4, 1882, to Voigt & Herpolsheimer, for the sale of three runs of stones; that he executed the contract of 1883 to the same parties for the sale of one run of stones,—and these contracts are made a part of his answer; that the grant to Stiven conveyed only a water power "equivalent to 45 horse power, and no more, as the same is ordinarily estimated;" that under the grant of three runs to Stiven, and the four runs sold to Voigt & Herpolsheimer, they were "entitled only to use 105 horse power, and no more, as ordinarily estimated;" that more power was required to propel the machinery than was required in an old-style mill; that the wheels were not set in such a manner as to secure the greatest amount of head and fall at the place of their use; that the draft tubes were not set in solid tail water, and in low stages of water there was a loss of about two or three feet head; that they had five large wheels to propel the mill; that the outlet for the water at the mill was not deep enough, and, in consequence, there was a loss of about one foot of head in a low stage of water; that they had constantly used from August, 1883, from 50 to 100 horse power more than they were entitled to use; that the controversy concerning the water rights was of such a character that it could be settled only by a construction of said deed from Powers to Stiven; and that, under that deed, they had no right to use at said mill more than 45 horse power. He denied that he had ever claimed that they should be required to grind on only three runs of stones according to the old-style grinding, and to use machinery adapted solely to said style of flour mills, and admitted that they had the right to grind on as many runs of stones as they pleased, and with the most improved and modern machinery, but claimed that the power granted to Stiven did not exceed 45 horse power, and that this was the limit of the power

granted under that deed. He admitted that they had the right to use that amount of power in any style of mill they might choose. The answer prayed the benefit of a cross-bill, an account of the quantity of water used at the mill, and the same relief against them that he had claimed in his bill against Hibbard & Graff. The answer also contained a prayer for general relief. Replication was filed, and Voigt & Herpolsheimer filed an answer to the cross-bill.

An order of revivor was made in the case on June 30, 1894. The proofs taken under the original bill were left to stand, and further proofs were taken before a commissioner. On December 12, 1896, the court below entered a decree finding:

(1) That in 1866 Mr. Powers owned the river front and the water privileges on the west side; that he constructed the canal on his own lands, and joined with the east-side owners in erecting the dam.

(2) That in 1866 the water power of the river was estimated at 2,000 horse power at ordinary stages, one-half of which belonged to the "West Side Water-Power Improvement."

(3) That the water power of the west-side canal was divided by Mr. Powers into two classes, the first including 66 runs of millstones, without priority between them in low stages, while the second class comprised the residue of the power, according to the statements in the original bill of complaint.

(4) That Mr. Powers and wife, in 1873, conveyed to Mr. Stiven the three runs of millstones described in the deed as of the first class.

(5) That the term "run of millstones" was and is a power equivalent to 15 horse power, and no more, whether used for flouring purposes or otherwise; that this was the maximum amount granted when the water in the river stands at ordinary or higher stages; that an ordinary stage exists when the surface of the water in the pond is on a level with the crest of the dam, and each canal is using its 1,000 horse power; that, when the water in the river falls below an ordinary stage, then each run is not entitled to its maximum amount, but only to its *pro rata* share of power; and that the water must be economically used.

(6) .That Voigt & Herpolsheimer purchased the Cres-
cent Mills in 1882, and also bought four additional runs of
the first class.

(7) That Voigt & Herpolsheimer, since 1883, have been
entitled to draw water from the canal, at ordinary
stages of the river, to the extent of seven runs of mill-
stones, or 105 horse power, and no more; and that, when
the water in the river and in the canal falls below an
ordinary stage, then the Crescent is entitled to draw water
power to the extent of 7-66 of the power in the canal, and
no more, according to the various heads at the different
drawing stations along the canal.

(8) That since August, 1883, the Crescent has drawn
water from the canal when it was at an ordinary stage, or
higher, in excess of 105 horse power, and that, when the
water in the canal was at lower stages, the Crescent has
drawn in excess of its *pro rata* share; that the mills have
not used the water power to which they were entitled in
such a manner as to secure the greatest amount of head
and fall, and have not always used the same carefully
and economically, but have, on the contrary, at various
times, misused and misapplied water power, and have
also contributed in part to the wrongful drawing down of
the reasonable and maintainable head; that, by reason of
such wrongful acts, Mr. Powers has sustained damages
to the amount of $7,000.

(9) That Voigt & Herpolsheimer are perpetually enjoined
from drawing water in excess of 105 horse power when
the water in the river is at an ordinary stage or higher,
and, when the water in the river is lower than an ordinary
stage, they are enjoined from drawing in excess of 7-66 of
the water power contained in the canal, according to the
various withdrawing stations.    They are also required to
refrain from taking and using water in any manner that
shall not secure the greatest amount of reasonable head
and fall at their mills, and are required to use the water
drawn in a careful and economical manner.

Powers was given costs.    Voigt & Herpolsheimer
appealed from this decree, they printing the record.
Powers also appealed upon the ground that the court
below did not award him a sufficient amount of damages.

1. It is contended by counsel for defendants that all the
owners of properties on the west-side canal and all the

owners of properties on the east side are necessary parties
to a regulation of the use of the water power on the west
side. It is contended that this question becomes of vital
importance from the fact that Mr. Powers, by his proofs,
sought to regulate the use of the water on the west side by
establishing a maintainable head, and to recover damages
for not maintaining that head; that this necessarily in-
cludes a partition of the water power, by determining what
the proprietors on each side are entitled to draw; that the
west-side canal, on account of its construction, draws
more water than the east side; that the court below
awarded damages against defendants for drawing down
in part a maintainable head; and that this the court could
not ascertain without knowing how much Powers had
been injured. This contention cannot be sustained. The
owners of the two canals, as early as 1866, had agreed in
writing to an equal division of the waters of the river.
They were the owners, and from that time no question
has arisen between them but that this contract has been
fully carried out by each, at least so far as shown by this
record. The only contention by defendants now is that
Mr. Powers has been getting more than his share of the
water. The grantees of Mr. Powers on the west-side
canal have no title to the dam, guard gates, canal, or
water in the canal. The title to all these properties is in
Mr. Powers. They are not tenants in common in any of
them. What right the defendants have is an easement
to draw a sufficient amount of water to develop a fixed
amount of power at their mill. They own their lands in
severalty, and the easement in severalty, and this ease-
ment is appurtenant to the land. Mr. Powers is asking
only that the defendants compensate him for the damages
which they have done to his individual property, and also
that they be restrained from doing further injury. In
*Turner* v. *Hart*, 71 Mich. 128, it was said:

"It is urged that relief should be denied to complain-
ants for the reason that they have each separate interests,
and are differently affected, at least in degree, by the act

complained of, and are therefore improperly joined in this suit. As the bill does not ask for an accounting, but only for injunctive relief, we think it is maintainable under our former decisions. * * * More especially are we inclined to so hold where the objection was not taken by special demurrer, but the parties have taken their proofs, and proceeded to a hearing thereon."

It was known at the commencement of this controversy that Mr. Powers had granted water rights to other parties along this west-side canal, for it was plainly stated in his original bill as against Hibbard & Graff. We think the defendants, if they desired to raise the question of want of necessary parties, should have raised it by demurrer before answer. *Snook* v. *Pearsall*, 95 Mich. 534. This was not done, but the defendants filed their supplemental bill, and in that asked that the suit be carried on between themselves and Powers.

2. Counsel for defendants contend that there is nothing involved here except a construction of the Stiven deed, although the answer to the supplemental bill filed by defendants Voigt & Herpolsheimer claims that those parties have used more than their share of water, and asks an account of the water so used in excess of what they were entitled to use. Counsel contend that this question cannot now be raised, as it is not within the scope of the supplemental bill, and cannot be raised by an answer to the bill claiming the benefit of a cross-bill, and because the necessary parties are not before the court, and have no opportunity to be heard.

We need not further discuss the question of want of necessary parties. Counsel lay down the proposition that a cross-bill should not introduce matters not embraced in the original bill; that it must grow out of the matter of the original bill, and must relate only to questions raised by the original bill, or to some matter in aid of a defense to it. Counsel cite, in support of this, 6 Am. & Eng. Enc. Law, 770, and notes. It is undoubtedly true that a cross-bill must be confined to the subject-matter of the

original bill, and a departure from it is not admissible; but this does not mean that new facts bearing on the subject-matter cannot be introduced into the case. It means that new facts foreign to the subject-matter cannot be so introduced. In 1 Beach, Mod. Eq. Prac. § 433, it is stated that a cross-bill "must be so directly and closely connected with the cause of action set up in the original bill as to render the cross-suit a mere auxiliary of the original suit, or a graft or dependency upon it."

In *Krueger* v. *Ferry*, 41 N. J. Eq. 432, 436, the court said :

" The new facts which it is proper for a defendant to introduce into a pending litigation by means of a cross-bill are such, and such only, as it is necessary for the court to have before it in deciding the questions raised in the original suit, to enable it to do full and complete justice to all the parties before it in respect to the cause of action on which the complainant rests his right to aid or relief."

In *Robins* v. *Swain*, 68 Ill. 197, 201, the court said :

"The matters alleged in the cross-bill are sufficiently connected with the matters alleged in the original bill to authorize relief in this way. The purpose of the original bill was to revise the decree of foreclosure, and such is also the purpose of the cross-bill. The relief sought by both is through a correction of the decree of foreclosure. It is not essential, nor is it usual, that all the facts which go to show that appellant is entitled to the relief sought should appear in the original bill."

In *Jones* v. *Smith*, 14 Ill. 229, the court held that a defendant to a bill in equity has a right to file his cross-bill stating new facts, if those facts are connected with the subject-matter of the original suit.

In *May* v. *Armstrong*, 3 J. J. Marsh. 260, 262, the court said :

"A cross-bill must be confined to the subject-matter of the bill. An entire departure from it is not admissible. If a bill is filed for a certain purpose, the defendant to the bill cannot, by any cross-bill, bring into litigation in that suit all causes of action which he may have against the complainant, unless there exist some special circumstances,

such as insolvency, nonresidence, etc., which would render it necessary in order to avoid irreparable injury. Thus, if a bill be filed for specific execution of a contract for land, the defendant cannot, by way of cross-bill, bring into litigation a fraud practiced on him by the complainant in swapping horses, or a debt due by the complainant unconnected with the contract concerning the land sought to be enforced. The cross-bill must relate exclusively to the subject-matter of the bill and things connected therewith, and foreign matter cannot be introduced, unless under special circumstances."

In *Nelson* v. *Dunn*, 15 Ala. 501, 513, the court said:

"It is true, the allegations of the cross-bill must relate to the subject-matter in controversy in the original bill; but the rule does not, as is supposed by the counsel, restrict its office so as to confine it to the issues in the original cause."

In *Davis* v. *Cook*, 65 Ala. 617, 625, the court said:

"We agree that, in the absence of special circumstances, the cross-bill can bring forward no new subject-matter not presented in the original bill. It can, however, and usually does, raise new issues relating to that subject-matter; may present equities relating to the subject-matter which arise between co-defendants, but which are not shown by the original bill; and generally may be resorted to, to secure such molding or modification of complainant's relief as to secure full relief to all parties."

In *Hurd* v. *Case*, 32 Ill. 45, 49, the court said:

"A cross-bill must, no doubt, be confined to the subject-matter of the original bill. A subject-matter of litigation foreign to the subject-matter of the original bill must not be admitted into a cross-bill. Here the subject-matter of the original bill was this mortgage, to foreclose which it was filed. If the subject-matter of the cross-bill were the specific performance of a contract for the sale of other lands, it would have no connection with the subject-matter of the original bill. Being foreign to such subject-matter, it would not be a proper subject of litigation for a cross-bill. Here the subject-matter of the cross-bill is the same as in the original bill. It only goes further, and states additional facts in relation to that subject-matter, which shows that the complainants in the cross-bill are

entitled to affirmative relief.    Such is the legitimate object
of a cross-bill.    When a defendant is entitled to affir-
mative relief in respect to the subject-matter of the original
suit, he can only obtain it by means of a cross-bill; and it
is very rare that all the facts which would entitle the de-
fendant to such affirmative relief appear in the original
bill, but almost invariably they have to be stated for the
first time in the cross-bill, and the only limitation as to
such new averments is that they must grow out of and
be connected with the subject-matter of the original bill."

See, also, *Griffin* v. *Griffin*, 112 Mich. 87.

Under these rules, we may now examine just how the
pleadings stand as affecting this question.    Mr. Powers
filed his bill against Hibbard & Graff, in which, among
other things, he alleged the conveyance of the mill site
and three runs of stones to Stiven; his interpretation of
that grant of power as being equivalent to 45 horse power;
that Hibbard & Graff had become the owners of the mill,
and were using water power in excess of that grant; that
their wheels were improperly set.    The bill prayed,
among other things, for a construction of the deed, and
for an account of the excess of water used.    It was an-
swered by Hibbard & Graff, proofs were taken, and a
decree rendered against them.[1]    This property was after-
wards sold on foreclosure of mortgage, and Voigt &
Herpolsheimer became the purchasers.    Mr. Powers did
not revive the litigation.    Voigt & Herpolsheimer did,
by filing their bill of revivor and supplement, and alleged,
among other things, as supplemental matter,—that is,
matter which had occurred subsequent to the filing of the
bill by Powers against Hibbard & Graff,—that they had
become the owners of the Hibbard & Graff interest, and
had entered into possession, and were operating such
mills; that controversies had subsequently arisen between
Powers and themselves touching the quantity of water
used at said mills by them, and the quantity they were
entitled to draw; that Powers claimed that the water

---

[1] This decree was set aside, upon application for rehearing, prior to
the filing of the supplemental bill by the present defendants.

rights and privileges granted were being abused, and water misapplied and wasted by them, which they denied. Powers filed his answer to this bill, which he asked might be taken as a cross-bill. In that answer or cross-bill, he alleged the following supplemental facts, which had been omitted from the statement in the Voigt & Herpolsheimer bill, viz. : That Voigt & Herpolsheimer had bought of him four additional runs of stones; that they had reconstructed their mill, so as to make a roller mill of it, and had changed the water wheels, which had been set with short draft tubes, and in other ways in an improper manner; that there was not sufficient clearance room, so that there was a loss of head; that they were using from 50 to 100 horse power more than the 105 horse power which they were entitled to use under the Stiven grant and the four additional runs purchased by them. The bill filed by Voigt & Herpolsheimer stated that they were operating "the mills, water power, and privileges, and easements appurtenant, for grinding wheat as merchant millers;" that this water power was conveyed by the Stiven deed; and that controversies had arisen between Powers and themselves with reference to their use of the water. Under the cross-bill, Mr. Powers would have the undoubted right to show how many runs were appurtenant to the mills, and to show to the full extent what the controversy was; that it involved complaints of short draft tubes, insufficient clearance room, and excessive drawing of water in low stages, and the drawing from the canal of more than 105 horse power. These questions are germane to the subject-matter of the original suit, and relate to the averments in the bill of Voigt & Herpolsheimer, for in that bill they allege that they have not wasted the water in the particular represented, or in any other manner. The facts are not foreign to the subject-matter of the original controversy, and are necessary for the court to have before it in deciding the questions raised in the original suit to enable it to do full and complete justice to the parties.

3. It is contended by counsel for defendants that the

Stiven deed must be construed as having granted and conveyed a power sufficient to grind 39 bushels of wheat per hour on three runs of stones, and to drive all the necessary machinery in connection therewith, and that this is the measure of the water power which they may draw from said canal for flouring purposes, and that they have a right to use this quantity of power or water upon any number of wheels, or upon any kind of improved machinery. On the other hand, it is contended by counsel for Mr. Powers that, under the Stiven deed, power sufficient to grind 39 bushels of wheat per hour on three runs of millstones, as they were then generally used in merchant mills, was fully granted; but that that grant contemplated that the extent of the power sold should be measured by putting the 39 bushels through three sets of burrstones at the same time, in accordance with the general custom in vogue in all flouring mills of those days. It is admitted by counsel for Mr. Powers that, when the extent of the power sold is fixed, the grantees can use that amount of power for any purpose they wish, in any kind of a mill; but it is claimed that the grant cannot be enlarged to a degree that 39 bushels of wheat per hour may be ground upon some new or slow process which will require more than 45 horse power to make or reduce 39 bushels of wheat per hour to flour.

The deed provides:

" He shall have the right to take and draw water from the said canal at all times hereafter, and use on said lands and premises, but not elsewhere, water for the purpose of power to the extent of three runs of millstones, as described below, which power may be used on said lands and premises for any purpose as propelling power. But, when used for flouring purposes, each of said run of millstones, as named and described below, shall be so understood that the same shall include all the machinery necessarily or ordinarily used for operating all departments of a flouring mill properly and economically conducted, which said three runs of millstones are of the first class, as hereinafter provided and explained."

In the *habendum* it is further provided:

"It being expressly understood that the term 'run of millstones,' as above used, is a power sufficient to grind, when used for grinding, 13 bushels of wheat per hour, and, when used for propelling machinery for other purposes, 15 horse power, as the same is ordinarily estimated."

It is further provided in the *habendum:*

"It being also expressly understood that the water power on the west side of Grand river * * * is divided * * * into two classes, the first of which classes includes and comprises 66 runs of millstones as above defined, numbered consecutively from 1 to 66, inclusive, none of which runs of millstones in said first class do or are to have any priority of right to the use of water in low stages thereof over or as against each other, but all of which said first class do and shall have such priority over all and any of the second class in case of low water, and which second class, numbering from 67 inclusive, are subrogated to the right of said first class in that respect," etc.

It is contended by counsel for Mr. Powers that this was a grant of only 3-66 of the west-side water power, whatever that might be; while counsel for defendants claim that it was a grant of three runs of millstones, defined as a power sufficient to grind, when used for grinding, 39 bushels of wheat per hour, and that the warranty of the grantor was a warranty of that much power to the grantee. Again, it is contended by counsel for defendants that the statement in the latter part of the deed that "none of which runs of millstones in said first class do or are to have any priority of right to the use of water in low stages thereof over or as against each other," if construed as contended for by Mr. Powers,—as limiting the grant to 3-66 of the west-side water, whatever that may be,—is inconsistent with and repugnant to the express terms of the grant, and is therefore void. Counsel cite many cases in support of this contention.

It is undoubtedly the rule that where an estate is expressly granted, and there follows a reservation, excep-

tion, or condition which destroys the grant, it is void, being repugnant to the thing first granted; and the rule is stated by Kent (4 Kent, Comm. 468) that when an estate is expressly granted or demised in the premises of a deed, and the *habendum* is repugnant to the estate granted or demised, the *habendum* is void; as, if a grant be to A. and his heirs, *habendum* to him for life, the *habendum* would be utterly void. In *Smith* v. *Smith*, 71 Mich. 633, this same rule was stated. This is the extent to which the cases cited by counsel for defendants go. But these rules must be understood and taken in connection with other rules of construction; as, where the grant is uncertain or indefinite concerning the estate intended to be vested in the grantee, the *habendum* performs the office of defining, qualifying, or controlling. *Sumner* v. *Williams*, 8 Mass. 162. Again, where it is impossible to determine from the deed and the surrounding circumstances that the grantor intended the *habendum* to control, the granting words will govern; but, if it clearly appears that it was the intention of the grantor to enlarge or restrict the granting clause by the *habendum*, the latter must control.

In *Bassett* v. *Budlong*, 77 Mich. 338, a quitclaim deed from a husband purporting to convey to his wife, and to her heirs and assigns, forever, the farm on which they resided, but which was declared to be upon certain express conditions and reservations following the *habendum* clause, viz.: (*a*) That the grantee should not convey or mortgage the land during the lifetime of the grantor without his written assent or his joining in the conveyance; (*b*) that, in case of the death of the grantee prior to the grantor's decease, the land should revert to him and his assigns,— was held not to convey the land to the grantee in fee simple absolute, but that the effect of the arrangement entered into was that the title should, in the event of the death of either of the parties, pass to the survivor. Certain rules of construction of deeds of conveyance were laid down in that case by Mr. Justice CHAMPLIN, as follows:

(1) The proposition that a condition, reservation, or exception which restricts a grant of a fee simple absolute title to land, being repugnant to the granting part of the deed, is void, can only be true in those cases where the repugnancy is such that the intention of the parties cannot be ascertained from the whole instrument, or, if ascertained, cannot be carried into effect in accordance with established principles of law.

(2) Every deed or contract is supposed to express the intention of the parties executing it, and, when the object or purpose of such instrument is called into question in a court of justice, the first inquiry is, What is the intention of the parties as expressed therein? and it is the duty of the court to so construe said instrument as to carry out such intent, if no legal obstacle lies in the way.

In *Bodine's Adm'rs* v. *Arthur*, 91 Ky. 53 (34 Am. St. Rep. 162), it was held that where there is a repugnancy between the granting clause and the *habendum* of a deed, and it cannot be determined from the whole instrument and the attendant circumstances that the grantor intended that the *habendum* should control, the granting clause must control; but, where it appears from the whole conveyance and the attendant circumstances that the grantor intended the *habendum* to enlarge, restrict, or repugn the granting clause, the *habendum* must control, for the reason that it is the last expression of the grantor's wish as to the conveyance. In a note to that case, as reported in 34 Am. St. Rep. 162, the rule is stated that the *habendum*, though repugnant to the estate previously granted, controls, if it is in accord with the intention of the grantor; and citing, in support of the proposition, *Fogarty* v. *Stack*, 86 Tenn. 610; notes to *Berridge* v. *Glassey*, 56 Am. Rep. 324 (112 Pa. St. 442), and *Bassett* v. *Budlong*, 18 Am. St. Rep. 409 (77 Mich. 338). See, also, *McCurdy* v. *Mining Co.*, 3 Nev. 27; *Downing* v. *Birney*, 112 Mich. 474.

Who can doubt, upon a reading of the whole instrument under consideration here, what the intention of the parties was as to the estate to be granted, when we take into consideration the attendant circumstances and sur-

roundings of the premises? But counsel for defendants insist that these attendant circumstances cannot be taken into consideration, as parol evidence cannot be received to modify, vary, or change the terms of the deed. While the attendant circumstances are introduced into this case by parol evidence, yet we may look at them to ascertain the intent of the parties, not for the purpose of varying the terms of the grant, to add anything thereto, or to take anything therefrom. It appears that this canal is nearly two-thirds of a mile in length. The surface of the water in it is much higher than the water in the rapids. The distance between the surface of the canal water and the surface of the water in the rapids increases rapidly from the dam to the lower end of the canal; and the plan or scheme laid out by Mr. Powers originally seems to have been that 66 runs of stones should be distributed along the whole length of the canal, from the dam to the lower terminus. There was sufficient power for driving this 66 runs of stones. This fact was determined by ascertaining the horse power in the canal at the ordinary stages of the water. It was found that, in ordinary stages of water, the canal could deliver for use at the several drawing stations sufficient water to operate 66 runs of millstones, or 990 horse power, but not so much in low water, though much more than that at times when there was an extra supply in the river; that, in order to ascertain the total water power of the canal, it was necessary to find the quantity of water needed by each of the 66 runs of stones located at the different drawing stations along the whole length of the canal, according to the fall at the respective mill sites where the water was withdrawn from the canal, as it was apparent that a run of stones operated at the foot of the canal would require much less water than one operated nearer the dam, as the quantity of water to operate a run of stones depended upon its location along the course of the canal, for the head or fall at a particular place must be determined first, in order to fix the quantity of water required to operate a run at that

place.   The scheme or plan was set forth in the general form of the deeds and leases used in making sales or letting privileges, so that each purchaser of power was informed, by the terms of his granting document, just what were his rights, and also what were the rights of his neighbors, as well as the reserved rights of the original proprietor.   By these grants, every run was to be used at some fixed point or site; and, when so located, the head or fall was known at once, and the quantity of water required to meet the grant could be readily ascertained.

In *Chesapeake & Ohio Canal Co.* v. *Hill,* 15 Wall. 94, it was held that "the state of things and surrounding circumstances in which an agreement is made will be looked at as a means of throwing light upon its meaning." This rule was also stated in *McConnell* v. *Rathbun,* 46 Mich. 305, and in *Smith* v. *Smith,* 71 Mich. 633.   It was further stated in *Chesapeake & Ohio Canal Co.* v. *Hill, supra,* that—

"A grant of a right to draw from a canal so much water as will pass through an aperture of given size and given position in the side of the canal is substantially a grant of a right to take a certain quantity of water in bulk or weight.   What that quantity is may be ascertained from the character and depth of the canal, the circumstances under which the water is to be drawn, and the state of things existing at the time the grant is made."

One of the first elements of construction is that the instrument must be interpreted so as to make the meaning and extent of the grant certain.   The deed states that the water power of the first class is to be divided into 66 equal parts, or 66 runs.   These are to be equal in power.   There was 990 horse power in the canal with the water at its ordinary stage.   The Stiven deed conveyed 3-66 of this power, and no more.   If all were to be equal, with only 990 horse power to divide, it must necessarily follow that Stiven took under his deed but 3-66 of the whole, or about 45 horse power.   But the deed says:  "It being expressly understood that the term 'run of millstones,' as above

used, is a power sufficient to grind, when used for grinding, 13 bushels of wheat per hour." While this is indefinite and uncertain as a measure of power, yet the testimony shows that with the stones then used in the ordinary mill there could be ground upon each stone from 13 to 15 bushels per hour. Mr. Voigt's head miller testified that millers and engineers understand that a run of millstones is the same thing as 15 horse power, and that either will grind from 12 to 15 bushels per hour in an old-fashioned mill. From a reading of the whole instrument, it must be held that the defendants have the right, under the Stiven deed, to draw from the canal 45 horse power, and no more, when the water in the river is at its ordinary stage.

We are also of the opinion that the parties themselves have given this interpretation to the Stiven deed. In 1882, Voigt & Herpolsheimer made a contract in writing with Mr. Powers for the purchase of three additional runs of stones, and made a conditional agreement for one run more, which was subsequently purchased by them. In paragraph 3 of that contract, it is expressly agreed that the water power in the canal was divided into two classes; that the first class was made up of 66 runs; and it is further said:

"It is expressly understood and agreed that the term 'run of millstones,' as herein used, is a power equivalent to 15 horse power, and no more."

While this paragraph might and probably does refer to the contract then being executed, yet it is further provided in paragraph 5 as follows:

"The parties of the second part contemplate making certain changes and repairs in the flouring mill now standing on the above-described lands and premises, and, when such repairs and changes shall have been completed, said parties of the second part may require more than 90 horse power to operate and run said mill. The party of the first part therefore agrees that, if additional power shall be required to operate and run said mill after such changes and repairs shall have been completed, he will

sell and convey to the parties of the second part   *   *   *
another run of stone, numbered 45 of said first class.   *
*   *   It is mutually agreed that, as soon as said repairs
and changes are completed, the parties hereto shall pro-
ceed and ascertain whether said mill can be operated and
run with 90 horse power, and, if more is required, then
the parties of the second part shall forthwith" purchase
additional power, etc.

At the time the contract of 1882 was made, it is evident
that defendants did not regard the Stiven deed as convey-
ing more than 45 horse power. We think the court below
was not in error in the interpretation given to the deed,
and in granting the injunction restraining the defendants
from drawing from the canal power to exceed that given
by the deed.

4. The only remaining question relates to the damages.
It would not be of profit to the parties or others to set out
the various claims made by the complainant upon that
question, or the defenses set up to such claims.  The tes-
timony upon which such claims and defenses are based is
very voluminous, and many tables have been prepared by
each side, which are claimed to show the respective theories
of the parties.  It is evident to us that the defendants have
used a great amount of power over and above that owned
by them.  They were entitled to use only 7-66 of the
power in the canal, which is equivalent to 105 horse
power; and the testimony shows, we think, very conclu-
sively, that at times they used from 150 to 175 horse power.
The court below found that complainant is entitled to re-
cover $7,000 for his damages; and we are not disposed
to disturb that finding, as we are satisfied, from a careful
examination of the testimony and the theories and claims
of the parties, that that amount has been proved.  While
it is true that the complainant claims many times that
amount, we are unable to say from this record that he
has established any greater claim.

The decree of the court below will be affirmed, with
costs in favor of complainant.

The other Justices concurred.