POWERS *v.* PERKINS.

1. WATER RIGHTS—SALE—CONSTRUCTION.
   Complainant built a water-power canal, the power of which was placed at 66 run of stone, or 990 horse power, known as "first-class power;" all over that being known as "second-class power." Defendant purchased one run of first-class power and two runs of second-class power. The latter could only be used when the canal developed more than 66 run of stone. No run of first-class power took any priority over other runs of the same class, but defendant's two runs of second-class power took priority over other runs of that class of power. *Held*, that the fact that the canal had a capacity of 1,000 horse power, instead of 990, did not entitle defendant to the use of one and two-thirds first-class runs and one and one-third second-class runs.
   132 Mich.— 3.

2. SAME—AMOUNT OF POWER.

> A decree that there could not be any second-class power until over 68,000 cubic feet of water was flowing into such canal per minute was a proper interpretation of the rights conferred by the owner of such water power.

3. SAME—EXCESSIVE USE—LIABILITY.

> Where a person purchases a certain amount of water power from the owner of an artificial waterway, constructed for the purpose of furnishing power, he is not entitled to a greater amount than he purchased, although there is water going to waste; and, if he uses more than he purchased, he must pay for it.

4. SAME—DAMAGES—FINDING OF COURT.

> In this case the proof on the question of damages was very conflicting, and the finding of the lower court, who heard the evidence, was not disturbed.

Cross-appeals from superior court of Grand Rapids; Newnham, J. Submitted October 10, 1902. (Docket No. 38.) Decided December 29, 1902.

Bill by William T. Powers against Willis J. Perkins to restrain the excessive use of water for power, and for an accounting. From the decree rendered, both parties appeal. Affirmed.

*Kingsley & Wicks*, for complainant.

*Loyal E. Knappen* and *Stuart E. Knappen*, for defendant.

MOORE, J. The questions involved in this litigation are stated by the judge of the superior court in a written opinion filed by him as follows:

"The complainant, William T. Powers, files his bill against the defendant, claiming damages on account of the excessive use of water on the part of the said defendant, and asking an injunction against the said defendant from using a certain wheel known as a 'Risdon Wheel,' and from using more than his just proportion of water. I find the facts in this case to be as follows: That William T. Powers, the complainant, built what is known as the

'West Side Canal;' that the power developed by said canal was placed at 66 run of stone, which was to be known as 'first-class power,' and that all above 66 run of stone, or 990 horse power, was to be known as 'second-class power;' that the said complainant deeded to one Harrison one run of first-class power and two runs of second-class power; that of the said first-class power none of the runs of stone took priority over the other, but that of the second-class power there was a priority, and that, when there was more water in the canal than was necessary to run the 66 run of stone of the first-class power, then the two run of stone which was sold by the said complainant to the said Harrison took priority over any other second-class run. The power which was purchased by Harrison was afterwards acquired by the defendant in this case.

"I find, under the evidence in the case, that during three months of the year there was a full head of water, in which not only all the first-class power could be used, but that the second-class power belonging to the defendant could also be used, but that during the balance of the year there was not enough to run any of the second-class power; that there was about four months of the year in which the run of stone of the first class belonging to the defendant could be used to its full capacity, but that for the balance of the year, and for a period of six months of the year, there was only what was known as a '50 per cent. canal.' The defendant placed in his factory, in order to run his machinery, what is known as a 'Risdon Wheel,' six feet in diameter, which required more than one run of stone to operate the same, and that in operating the same the said defendant did use more of the water than he was entitled to; that the said Risdon wheel was put in against the objection of the complainant, and against his protest; that the said Risdon wheel occasioned a waste of water on the part of the defendant. I find, also, as a matter of law, that the defendant was only entitled, when the water was below that stage which was required to develop 66 run of stone, to ⁶⁄₆₆ of the power, but that he used more than his just proportion. It is a difficult matter to estimate the damages correctly in this case which should be awarded to the complainant, but I am of the opinion that the sum of $3,000 would not exceed the amount which the defendant should pay for the extra water which he has consumed. I find also that the complainant is entitled to a perpetual injunction restraining the said defendant from using more

than his just proportion, or from using any wheel which will require a greater amount of water to run it than he is entitled to."

A decree was entered in accordance with the opinion. It is the claim of complainant that, under the proofs, he should have been awarded upwards of $9,000. The defendant claims that, if he used any water in excess of what he had a right to use,—which he does not admit,— the damages were nominal, not more than $466.66. He also claims the decree is wrong as to what constitutes low water. Both parties appeal.

In the case of *Powers* v. *Hibbard*, 114 Mich. 533 (72 N. W. 339), many of the questions involved in this case arose. A copy of the deed given to persons entitled to use water is set out in that case. A reference to it will make it unnecessary to make so long a statement here as would otherwise be necessary.

Mr. Perkins is the owner of one run of first-class power and two runs of second-class power. Instead of putting in two wheels, one of which might be used when he was entitled to use only first-class power, he put in only one wheel, which, according to a table introduced by him in evidence, developed 49 horse power at ordinary head. The use of this wheel is shown by the cross-examination of Mr. Perkins as follows:

" *Q.* Now, what did Mr. Powers or Mr. Spooner say their objections were to the Risdon wheel, aside from combining the first and second class runs upon it? In other words, didn't they say, when you only used one run of the first class, that wheel would not use it economically?

"*A.* That was the substance of their answers.

" *Q.* Now, you say that, prior to the decision in the *Voigt Case* by the Supreme Court, you believed that you had a right to use 45 horse power on the Risdon wheel at ordinary stages?

"*A.* Yes, sir.

" *Q.* Combining the first and second class together at ordinary stages?

"*A.* Yes, sir.

"*Q.* And that you also had the right absolutely to 15 horse power of the first class at all stages of the water?

"*A.* When I could secure it.

"*Q.* So that was the theory on which you had been operating the shop from the time you started it up until the decision in the *Voigt Case?*

"*A.* In the Supreme Court?

"*Q.* In the Supreme Court, I mean.

"*A.* Yes, sir.

"*Q.* Forty-five horse power at ordinary stages and 15 horse power on the first-class run whenever you could secure it?

"*A.* Yes, sir.

"*Q.* Without regard to the stage of water in the canal?

"*A.* Practically.

"*Q.* Well, then, under that theory the practice necessarily must have been that, as long as there was power in the canal, you ran this Risdon wheel with the gates wide open, in low stages?

"*A.* Yes, sir; in low stages.

"*Q.* And ordinary stages,—that is, down to a five-foot head?

"*A.* Oh, we would not need it. We ran the wheel many months without it being wide open.

"*Q.* That would be when there was a higher head?

"*A.* Yes, sir; we didn't need it.

"*Q.* Did you ever have occasion to observe at what particular head the Risdon wheel could be run with the gates wide open, and furnished power to operate your shop and keep it up to motion?

"*A.* I could not answer that, sir.

"*Q.* Assuming that that was a five-foot head, then you would run the Risdon wheel from that head of five feet down through four and a half, four, and three, or whatever it might be, with the gates wide open?

"*A.* The gates open wide enough to get power to run the shop; not necessarily wide open.

"*Q.* They must necessarily be wide open, if you pay heed and discriminate on the question, when I say a five-foot head will just furnish the power with the gates wide open, every one of them.

"*A.* If we assume that?

"*Q.* Yes, sir; that is the question. You say you don't know what head. Now, I am assuming a five-foot head. That was the question.

"*A.* Yes, sir.

" *Q.* Haven't you been in the shop, and given instructions, when it was not running to motion, to see if you could not open the gate of the wheel wider?

"*A.* Yes, sir.

" *Q.* And tried the hand wheel?

"*A.* I cannot say that I ever tried the hand wheel myself.

" *Q.* Ordered others to try it?

"*A.* Probably have.

" *Q.* In order to get power enough to run the shop to motion?

" *A.* That is, when there was a low head.

" *Q.* Under a low head?

" *A.* Yes, sir.

" *Q.* Now, since the Voigt decision in the Supreme Court you have changed the rule, or rather the practice, of drawing water from the canal?

" *A.* Yes, sir.

" *Q.* Now, just what change have you made, since the decision in the Supreme Court, in the practice and rules and instructions; in other words, what were your instructions?

" *A.* My instruction was to run the large wheel when the water was running over the crest of the dam.

" *Q.* And when it was not running over?

" *A.* Then we would put on our steam power.

" *Q.* When did you put in the American?

" *A.* I could answer that question by looking up the dates, but I couldn't give it to you offhand, sir.

" *Q.* Did you use the Risdon wheel before the American was put in, and after the decision of the Supreme Court in the *Voigt Case*, when the water was below the crest?

" *A.* We didn't make a practice. It may have been used some. I couldn't answer you that positively. It may have been used some when I was out of the city. I am out of the city a month and two months at a time.

" *Q.* Did you ever make any inquiries of your engineer, or those that were operating your shop, what head your drawing station required to run the shop to full motion on the Risdon wheel alone?

"*A.* Not that I am aware of.

" *Q.* Why didn't you make some inquiries, or at least know the use of the water at that drawing station?

"*A.* Well, if we had the water, we used it, and, if we

didn't, we couldn't.    That was all there was about it.

" *Q.* You didn't care about the details ?

"*A.* I didn't go into the details of the head because, as I said before, I assumed we had the right to use the power.

" *Q.* You would use it whether you had a five-foot head or a three-foot head ?

"*A.* I wasn't aware that the people below me were taking any cognizance of the head.

" *Q.* Were you paying any attention to your *pro rata* share of the water in relation to other owners and users along the canal ?

"*A.* I would have to look at the deed to see whether that term occurs in there before I would answer that.

" *Q.* You know as a matter of fact during these years whether you paid any heed to the other owners or users ?

"*A.* No.

" *Q.* Without regard to the language of the deed ?

"*A.* I said I didn't.

" *Q.* That is, you mean you didn't pay any heed to them ?

"*A.* No, I did not.

" *Mr. Knappen:* I don't know as I understand the witness now,—the answer ' I didn't,'—whether he didn't pay any attention or whether he didn't know.

" *Mr. Kingsley:* He said he didn't, as a matter of fact.

" *Q. By the Court:* Is that what you mean ?

"*A.* That is what I mean.    I simply had the right to use it.

" *Q.* Since the Voigt decision you have used water from that canal when it was below the crest of the dam, have you not ?

"*A.* Certainly, and we are entitled to it.

" *Q.* You always did that, didn't you ?

"*A.* Sir ?

" *Q.* You have always been entitled to use water from the canal when it was below the crest ?

"*A.* We haven't had a small wheel in until recently. We use it with a small wheel below the crest of the dam.

" *Q.* Did you ever have occasion to inquire how many cubic feet the Risdon draws at five feet, four feet, or three feet ?

"*A.* Do you mean head ?

" *Q.* Yes, sir; I mean head.

"*A.* I never took the opportunity of inquiring.

" *Q.* When these various notices were sent to you that have been spoken of and been introduced in evidence as to the use of the water and the *pro rata* share of each, did you pay any heed to those?

" *A.* Those notices were generally received three or four days after the measurement was taken, and in many instances we had a full head when the notices were received, and the water was not at the stage described in the notice.

" *Q.* In other words, you mean you knew more about the state of the head and the condition of it at your drawing station than the notice gave you?

" *A.* I certainly do if there is a rainstorm in the meantime, and if I receive that notice three days after it was taken.

" *Q.* I think that is correct.

" *A.* Sure.

" *Q.* Then you had no use for the notices anyhow?

" *A.* I don't say that.

" *Q.* Well, I will ask you that question, were they of any use to you?

" *A.* Why, yes, sir; in a certain respect. We tried to respect them to a certain extent, and did, after we received the notice of the Supreme Court, in regard to the decision.

" *Q.* I am speaking about Mr. Powers' private notices, before the Supreme Court notified you. Did you pay any attention to those?

" *A.* Not any material attention, because, as I stated, I supposed we had the right.

" *Q.* And you state further that those notices came to your hands after you had used the water on those particular days which the notices came?

" *A.* Most certainly. They were mailed and figured up and sent to me.

" *Q.* And you knew the state of the water better than the notices gave it to you?

" *A.* I knew the state at that time better than the notice which referred to several days before."

It is impossible to read the testimony of Mr. Perkins without reaching the conclusion that for years he has been in the habit of using water in excess of what he is entitled to use. It is the claim of defendant that the canal had a capacity of 1,000 horse power, instead of 990, and that, when the 66 run of stone were satisfied, there was still an

excess of 10 horse power, when the water was at the average stage, which he was entitled to use. This is but another way of saying that, though he bought but one first-class run and two second-class runs, he is in fact entitled to one and two-thirds first-class run and one and one-third second-class run. In *Powers* v. *Hibbard, supra,* it is said:

"But counsel for defendants insist that these attendant circumstances cannot be taken into consideration, as parol evidence cannot be received to modify, vary, or change the terms of the deed. * * * It appears that this canal is nearly two-thirds of a mile in length. The surface of the water in it is much higher than the water in the rapids. The distance between the surface of the canal water and the surface of the water in the rapids increases rapidly from the dam to the lower end of the canal; and the plan or scheme laid out by Mr. Powers originally seems to have been that 66 runs of stones should be distributed along the whole length of the canal, from the dam to the lower terminus. There was sufficient power for driving this 66 runs of stones. This fact was determined by ascertaining the horse power in the canal at the ordinary stages of the water. It was found that, in ordinary stages of water, the canal could deliver for use at the several drawing stations sufficient water to operate 66 runs of millstones, or 990 horse power, but not so much in low water, though much more than that at times when there was an extra supply in the river; that, in order to ascertain the total water power of the canal, it was necessary to find the quantity of water needed by each of the 66 runs of stones located at the different drawing stations along the whole length of the canal, according to the fall at the respective mill sites where the water was withdrawn from the canal, as it was apparent that a run of stones operated at the foot of the canal would require much less water than one operated nearer the dam, as the quantity of water to operate a run of stones depended upon its location along the course of the canal, for the head or fall at a particular place must be determined first, in order to fix the quantity of water required to operate a run at that place. The scheme or plan was set forth in the general form of the deeds and leases used in making sales or letting privileges, so that each purchaser of power was informed, by the terms of his

granting document, just what were his rights, and also
what were the rights of his neighbors, as well as the
reserved rights of the original proprietor. By these grants,
every run was to be used at some fixed point or site; and,
when so located, the head or fall was known at once, and
the quantity of water required to meet the grant could be
readily ascertained."

We do not think the claim of defendant was contem-
plated by the owner of the power or the original purchaser
of it, or is sustained by the proofs.

Complaint is made of the following portion of the
decree :

"It is further decreed, according to the plan of said canal
there was not and cannot be any second-class power until
after the water in the pond is flowing freely over the crest
of the dam, when that structure is in ordinary repair, or
over 68,000 cubic feet of water is flowing into the canal
per minute, which amount of water is required to constitute
a canal which will develop 66 runs of millstones of the
first-class."

Without going into the matter in detail, we think this
a proper interpretation of the rights conferred by the
owner of the power.

Counsel say :

"When the canal furnishes as low as 5 ft. 6 in. head at
Mr. Perkins' drawing station (being a 90 per cent. canal),
all the runs of Mr. Powers located and equipped with
wheels, or ever prepared for use, whether assessed for ex-
penses of maintaining the canal or not, could be operated
to their full capacity. We make no claim that, when the
water is below a stage at which the lawful demands of all
located power can be supplied, the defendant could be per-
mitted, by overuse of his right, to curtail the full enjoy-
ment of Mr. Powers of his located rights; but we do con-
tend that, so long as that point is not reached, Mr. Perkins
has the right to all his power of both classes to the extent
the canal will supply it. As, under such circumstances,
no one is in the slightest degree trespassed upon, this con-
struction does no violence to the terms of the contract
defining the respective rights of the parties to this contro-
versy. The proposition of counsel that the right to the
water of a river flowing in a natural channel, and the right

to the water flowing in an artificial channel, such as a canal, do not rest upon the same principles, and that in the case of a canal the right to draw from it rests exclusively upon the grant, and is limited by it, has no application to the facts of this case. The only prohibition in the grant itself against the use of second-class runs is that they 'shall not be used when, by reason of low water, their use will prevent the fair and ordinary use of any of the first class, and the rights of the owners thereof.' Manifestly, no owner of first-class power could complain of a use by other owners which did not affect the 'fair and ordinary use' by such holder. It would palpably be unfair, and against both the spirit and the letter of the 'grant,' to deny Mr. Perkinks the right to use his second-class runs, when otherwise the water would go to waste."

We cannot agree with this contention. If it is true, Mr. Perkins, by buying one run, could use several, and Mr. Powers would have no right to complain, simply because he had not found purchasers for the other runs. This is an artificial waterway, constructed for the purpose of furnishing power, some of which was to be sold. A purchaser of power was entitled to what he bought, and no more. If his needs require more power than he has purchased, he should buy more; and, if he does not do so, but uses power in excess of what he has purchased, he must pay for it.

This brings us to the question of damages. Complainant submits the following table of damages:

| Months. | Excess in H. P. | Value. |
|---------|-----------------|--------|
| 3 Mos.  | None.           | $000 00 |
| 1 Mo.   | 22 h. p.        | 114 40 |
| 2 Mos.  | 56 h. p.        | 291 20 |
| 6 Mos.  | 44 h. p.        | 686 40 |
| One year. | 122 h. p.     | $1,092 00 |

Total, 8⅓ years, at $1,092 per year, is $9,100.

Counsel for defendant question these figures in nearly every particular, and submit a computation which shows the damages amount to but $466.66. Proof is offered in respect to these respective claims. We have already

decided what constitutes low-water mark, and disposed of the claim that the canal carried 1,000 horse power. It is impossible to figure out with any degree of accuracy the damages to which complainant is entitled. There is great conflict in the testimony. We are very clear that complainant should recover much more damages than defendant says he is entitled to. The judge who heard all the testimony gave complainant substantially all to which he was entitled.

The decree is affirmed, without costs in this court to either party.

HOOKER, C. J., GRANT and MONTGOMERY, JJ., concurred.